IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:10-CR-71-D

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| CIPRIANO DIAZ-GALIANA, | ) |
| | ) |
| Defendant. | ) |

On January 10, 2011, Cipriano Diaz-Galiana ("Diaz-Galiana" or "defendant") pleaded guilty to illegal reentry by an aggravated felon in violation of 18 U.S.C. § 1326. The statutory maximum for violating 18 U.S.C. § 1326 is twenty years' imprisonment.

On August 3, 2011, the court held the sentencing hearing. After considering all of the evidence presented and the arguments of counsel, the court upwardly departed, considered all of the factors under 18 U.S.C. § 3553(a), and sentenced Diaz-Galiana to 120 months' imprisonment. The court enters this order to explain Diaz-Galiana's sentence.

I.

The court has reviewed the revised Presentence Investigation Report ("PSR") and adopts the facts stated in the PSR. See Fed. R. Crim. P. 32(i)(3). On May 12, 2010, officers from the Robeson County Sheriff's Office, Lumberton, North Carolina, and the Drug Enforcement Administration (DEA), arrested Diaz-Galiana during a drug investigation. PSR ¶ 3. The investigation also involved Diaz-Galiana's son, Vicente Diaz-Tapia,[1] and three other co-conspirators. Id. Officers seized 300 pounds of marijuana (135 kilograms) and Diaz-Galiana currently has drug charges pending against

---

[1] Vicente Diaz-Tapia is the same son who submitted a character letter in support of his father and claimed to have a family-owned business in California. See Def.'s Sent'g Mem., Ex. E at 2.

him in Robeson County Superior Court. Id. ¶¶ 3, 31 & n.1.[2] Diaz-Galiana was in possession of false documentation and identified himself to the officers as Juan Vasquez. Id. ¶ 3.[3] Diaz-Galiana is a Mexican citizen who has previously been deported nine times. Id.[4] On May 13, 2010, officers went to Diaz-Galiana's residence and Diaz-Galiana's common-law wife gave the officers permission to search the property. Id. Officers found 7 firearms and over 1,000 rounds of ammunition, and they also found $10,000.00 in U.S. currency buried on the property. Id. Diaz-Galiana admitted that he possessed one of the pistols, and in fact was charged in count two of the indictment with being an alien illegally and unlawfully in the United States who knowingly possessed seven firearms and ammunition in and affecting commerce. Diaz-Galiana admitted that he settled in Rose Hill, North Carolina after he illegally reentered the United States in 2002. Id. ¶ 35. On July 20, 2004, Diaz-Galiana was detained by ICE and deported. Id. ¶¶ 3, 29. He claims to have remained in Michoacán, Mexico until 2008. Id. ¶ 35. However, on July 16, 2006, defendant was detained in San Diego, California and administratively removed. Id. ¶ 30. In 2008, Diaz-Galiana illegally returned to the

---

[2] Diaz-Galiana did not object to the inclusion of this information in the PSR. See PSR add. At sentencing, Diaz-Galiana's counsel represented to the court that he had spoken to the Robeson County District Attorney, who told counsel that he planned to dismiss the drug charges against Diaz-Galiana. However, counsel admitted that he was not aware of the current status of the drug charges.

[3] Failing to provide his true name is nothing new for Diaz-Galiana. According to the PSR, Diaz-Galiana has at least 31 names, 6 dates of birth, and 2 social security numbers listed as alias identifiers. See PSR 2.

[4] Specifically, Diaz-Galiana was deported or removed from the United States on July 21, 1976 via Calexico, California; on February 23, 1977, and February 5, 1981, via San Ysidro, California; on December 13, 1988, via Calexico, California; on October 15, 1993, via Miami, Florida; on May 23, 1997, via Nogales, Arizona; on March 29, 2001, via Boston, Massachusetts; on July 20, 2004, via Laredo, Texas; and on July 16, 2006, via Otay Mesa, California. PSR ¶ 3.
Additionally, it appears Diaz-Galiana has been detained and/or voluntarily removed on 7 other occasions. See id. ¶¶ 20, 22, 23, 24, 26; see also id. ¶ 25 (United States declined to prosecute Diaz-Galiana and released him after arrest for illegal entry and alien smuggling).

United States (again) and returned to North Carolina. Id. ¶ 3.

Diaz-Galiana pleaded guilty, pursuant to a written plea agreement, to illegal reentry after deportation by an aggravated felon, in violation of 8 U.S.C. § 1326(a) and (b)(2). Id. ¶¶ 1–2. The statutory penalty for illegal reentry after deportation by an aggravated felon is not more than 20 years' imprisonment and a $250,000 fine. 8 U.S.C. § 1326(b)(2); 18 U.S.C. § 3571(b)(3). The base offense level for unlawful entry is 8. See U.S.S.G. § 2L1.2(a). Diaz-Galiana's conviction for a felony drug trafficking offense for which the sentence imposed was 13 months or less mandates a 12-level enhancement. PSR ¶ 47; U.S.S.G. § 2L1.2(b)(1)(B). After a 3-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a)–(b), Diaz-Galiana's total offense level is 17. See PSR ¶¶ 53–54.

Diaz-Galiana has a lengthy criminal history. He has been convicted on five different occasions in U.S. District Court for illegal entry. Id. ¶¶ 6–9, 15. On at least two of those occasions, Diaz-Galiana was attempting to transport or guide other illegal aliens into the United States. See id. ¶¶ 7, 9. Diaz-Galiana has eight convictions which are not scored due to time limitations. Id. ¶¶ 6–13. One of those unscored convictions is for accessory after the fact to murder, where Diaz-Galiana drove his codefendant to a location where the codefendant shot and killed a person, and then Diaz-Galiana allowed the codefendant to stay at his residence. Id. ¶ 11. He also has an unscored drug trafficking conviction and an unscored conviction for carrying a concealed weapon. Id. ¶¶ 12–13. Diaz-Galiana has scored convictions for making false statements in a passport application and two convictions for illegal entry, resulting in 5 criminal history points. Id. ¶¶ 14–15, 17. The revised PSR includes 2 points for committing the instant offense while Diaz-Galiana was under a criminal justice sentence, see id. ¶ 18, but the court concludes that the facts do not support this 2-

3

point adjustment.[5] Diaz-Galiana's 5 criminal history points establish a criminal history category of III. See U.S.S.G. § 5A (sent'g table). Based on a total offense level of 17 and a criminal history category of III, the applicable advisory guideline range is 30 to 37 months. U.S.S.G. § 5A (sent'g table).

The revised PSR indicates that an upward departure may be warranted pursuant to section 4A1.3 (inadequacy of Diaz-Galiana's criminal history category) or pursuant to section 5K2.21 (dismissed and uncharged conduct). PSR ¶¶ 68–69. Therefore, the PSR provides sufficient notice of the court's consideration of an upward departure. See Fed. R. Crim. P. 32(h); United States v. Hott, 320 F. App'x 156, 157 (4th Cir. 2009) (per curiam) (unpublished); United States v. Spring, 305 F.3d 276, 282 (4th Cir. 2002). There are no objections to the revised PSR. PSR add.

II.

The Supreme Court has described the process for imposing a sentence under the now-advisory sentencing guidelines:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing] Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then

---

[5] The adjustment under section 4A1.1(d) is appropriate if, at the time the defendant committed any part of the instant offense, a warrant for a supervised release violation is outstanding. U.S.S.G. § 4A1.1, cmt. n.4; id., § 4A1.2(m). Accordingly, the question becomes whether the bench warrant was still "outstanding" when Diaz-Galiana reentered the United States in 2008. The docket report, United States v. Diaz-Rosa, No. 5:96-cr-43-RT-1 (C.D. Cal), reflects that the bench warrant was issued on February 2, 1999. On June 10, 1999, the court for the Central District of California transferred jurisdiction over Diaz-Galiana to the Southern District of California. On May 19, 2005, the bench warrant was returned unexecuted [D.E. 28], and the docket entry notes that it was "superseded" by transfer to the Southern District of California. The PSR does not provide any additional information. Thus, the court is unable to find by a preponderance that the bench warrant was still outstanding at the time Diaz-Galiana reentered the United States.

4

consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

Gall v. United States, 552 U.S. 38, 49–50 (2007) (footnote and citations omitted); see Pepper v. United States, 131 S. Ct. 1229, 1241–45 (2011); Nelson v. United States, 129 S. Ct. 890, 891–92 (2009) (per curiam); Spears v. United States, 555 U.S. 261, 263–64 (2009) (per curiam); Kimbrough v. United States, 552 U.S. 85, 101 (2007) ("[W]hile the statute still requires a court to give respectful consideration to the Guidelines, [United States v.] Booker[6] permits the court to tailor the sentence in light of other statutory concerns as well." (citations & quotation omitted)); Rita v. United States, 551 U.S. 338, 357–58 (2007); United States v. Diosdado-Star, 630 F.3d 359, 363–366 (4th Cir. 2011); United States v. Carter, 564 F.3d 325, 328–30 (4th Cir. 2009); United States v. Evans, 526 F.3d 155, 160–61 (4th Cir. 2008); United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007). The court recognizes its duty within this framework to "make an individualized assessment based on the facts presented," Gall, 552 U.S. at 50, and to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [the sentencing statute]." 18 U.S.C. § 3553(a); see, e.g., Spears, 555 U.S. at 263–64; Kimbrough, 552 U.S. at 100–01; Carter, 564 F.3d at 328–30.

III.

First, the court must calculate the applicable advisory guideline sentencing range. See, e.g., Gall, 552 U.S. at 49–50. As mentioned, the applicable advisory guideline sentencing range is 30 to 37 months. See supra pp. 3–4 & note 5. The court next must determine whether a sentence within the applicable advisory guideline sentencing range serves the factors set forth in 18 U.S.C. § 3553(a)

---

[6]543 U.S. 220 (2005).

5

and, if not, select a sentence within statutory limits that does serve those factors. See, e.g., Gall, 552 U.S. at 49–50; Pauley, 511 F.3d at 473. In doing so, the court may look to whether a departure is appropriate based on the sentencing guidelines or relevant case law. See Diosdado-Star, 630 F.3d at 366; Pauley, 511 F.3d at 473. The court also must consider whether the factors set forth in 18 U.S.C. § 3553(a) warrant a variance. See Diosdado-Star, 630 F.3d at 366; Pauley, 511 F.3d at 473. Provided that "at least one rationale is justified and reasonable," "the method of deviation from the Guidelines range . . . is irrelevant." Diosdado-Star, 630 F.3d at 365–66.

A.

Criminal history category III applies to Diaz-Galiana. An upward departure under U.S.S.G. § 4A1.3 may be warranted when a defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that defendant will commit other crimes. See U.S.S.G. § 4A1.3(a)(1); United States v. Myers, 589 F.3d 117, 125 (4th Cir. 2009); United States v. Lawrence, 349 F.3d 724, 726–27 (4th Cir. 2003). Under section 4A1.3(a)(4)(A), "the court shall determine the extent of a departure under this subsection by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's." U.S.S.G. § 4A1.3(a)(4)(A). The background commentary to section 4A1.3 recognizes that "the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur." U.S.S.G. § 4A1.3 cmt. background. For example, "a defendant with an extensive record of serious, assaultive conduct who had received what might now be considered extremely lenient treatment in the past might have the same criminal history category as a defendant who had a record of less serious conduct." Id. In conducting this determination, the court may "move to successively higher categories only upon finding that the prior category does not provide a sentence that adequately

6

reflects the seriousness of the defendant's criminal conduct." United States v. Cash, 983 F.2d 558, 561 (4th Cir. 1992).

As for section 5K2.21, an upward departure may be warranted to reflect the actual seriousness of the offense based on dismissed or uncharged conduct that did not enter into the determination of the applicable guideline range. See U.S.S.G. § 5K2.21.[7] Section 5K2.21 requires only "'some degree' of connection between charged and uncharged offenses, and even a 'remote connection' will suffice to support the departure." United States v. Sutton, 401 F. App'x 845, 848 (4th Cir. 2010) (per curiam) (unpublished) (quoting United States v. Newsom, 508 F.3d 731, 735 (5th Cir. 2007)). Here, in count two, the indictment charged:

> On or about May 13, 2010, in the Eastern District of North Carolina, the defendant, CIPRIANO DIAZ-GALIANA, also known as "Vicente Diaz-Rosas", "Vicente Diaz Rosas", and "Vicente Diaz", being alien illegally and unlawfully in the United States, knowingly possessed, in and affecting commerce, firearms and ammunition, specifically: (1) Colt .22 caliber pistol; (2) silver plated Colt .38 caliber pistol; (3) .38 super auto ammunition; (4) Colt .380 caliber pistol with ten rounds; (5) .380 auto ammunition; (6) AKS-762 Polytech rifle and ammunition; (7) Beretta .380 caliber pistol; (8) Remington .22 caliber rifle with 6 rounds; (9) 12 gauge Stevens by Savage shotgun, in violation of Title 18, United States Code, Section 922(g)(5)(A) and 924(a)(2).

Indictment 3. As part of the plea agreement, the United States agreed to dismiss count two, and count two did not enter into the determination of the applicable guideline range.

First, the court determines that an upward departure under section 4A1.3(a) is appropriate and that the court should increase defendant's criminal history category. See United States v.

---

[7] U.S.S.G. § 5K2.21 provides:

The court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range.

7

Ruvalcava-Perez, 561 F.3d 883, 885–87 (8th Cir. 2009) (affirming upward departure under section 4A1.3 where the defendant was a "serial violator" with regard to illegal reentry). Diaz-Galiana is 56 years old and has a deeply troubling history of relentless criminal conduct. Diaz-Galiana has spent much of his adult life committing crimes, resulting in 10 convictions. Furthermore, Diaz-Galiana's criminal history is replete with examples of leniency, see, e.g., PSR ¶¶ 7–9, including a lack of punishment for repeated violations of federal immigration law. See, e.g., id. ¶¶ 20–30. Diaz-Galiana has entered (and reentered) the United States illegally, and relentlessly, for 35 years. Since 1976, Diaz-Galiana has been detained, prosecuted, deported, and/or removed from the United States at least 16 times. Diaz-Galiana also has attempted to obtain a U.S. passport by submitting false documentation. Id. ¶ 14; see id. at 2 (listing his numerous alias identifiers). His behavior shows a complete disregard for the laws of the United States and the criminal justice system. Moreover, Diaz-Galiana's criminal behavior goes far beyond his mere presence in this country. In 1983, he was charged with murder and eventually pleaded guilty to accessory after the fact. Id. ¶ 11. In 1987, Diaz-Galiana was convicted of a drug trafficking offense. Id. ¶ 12. In 1993, he was convicted of carrying a concealed weapon. Id. ¶ 13. None of these offenses were scored in calculating Diaz-Galiana's criminal history category.

In purported mitigation of his criminal behavior, Diaz-Galiana argues that most of his convictions are many years old, he is less likely to reoffend at his age, and he has a young family in Michoacán, Mexico.[8] Diaz-Galiana also claims that he owns property in Michoacán, Mexico, which

---

[8] According to the PSR, Diaz-Galiana has three families. Diaz-Galiana's former wife, Maria Concepcion-Tapia, lives in Riverside, California with their four children, ages 28, 24, 19, and 13. See PSR ¶ 34. Diaz-Galiana has two children, ages 14 and 12, who live in Playa Azul, Michoacán, Mexico with their mother, Irasema Vasquez. Id. Diaz-Galiana also has three children, ages 9, 7, and 2, who currently live in Playa Azul, Michoacán, Mexico with their mother, Maria Idalia Vargas-Mendoza. Id. The PSR also states that Diaz-Galiana's common-law wife was the person who

8

has recently been condemned by the government, and the proceeds from the condemnation will permit him and his young family to move out of Mexico and start a new life in Costa Rica.

In light of the entire record, the court finds that defendant's record, which spans 35 years, reflects recidivism and a near certain likelihood of future recidivism. See U.S.S.G. § 4A1.3(a)(1). The court also finds that criminal history category III woefully fails to account for the nature and seriousness of Diaz-Galiana's criminal history or the likelihood that he will commit other crimes. An upward departure based on a similar combination of many of the above stated facts — namely, an extensive history of criminal conduct, a history of lenient treatment, and a serious risk of recidivism — is supported by case law. See, e.g., Myers, 589 F.3d at 125–26 (affirming departure based on both the defendant's extensive criminal history that was stale under § 4A1.2(e), and defendant's failure to change despite federal incarceration and supervised release); United States v. Grubbs, 585 F.3d 793, 803–05 (4th Cir. 2009) (affirming departure based on criminal history category under-representing defendant's criminal history and likelihood of recidivism); Ruvalcava-Perez, 561 F.3d at 885–86 (affirming departure based on defendant's status as a "serial violator" of reentering the country illegally); United States v. Whorley, 550 F.3d 326, 339–43 (4th Cir. 2008) (affirming sentence that was 131 months above advisory guideline calculation and 60 months above statutory minimum based, in part, on under-representation of the defendant's criminal history); Evans, 526 F.3d at 159–60, 162–66 (affirming 95-month departure based, in part, on under-representation of defendant's criminal history); United States v. Harris, 241 F. App'x 88, 91 (4th Cir. 2007) (per curiam) (unpublished) (affirming departure based, in part, on extensive criminal history that was stale under § 4A1.2(e)); United States v. Denkler, 232 F. App'x 336, 340–41 (4th Cir. 2007)

---

consented to the search of their home in Robeson County on May 13, 2010. See PSR ¶ 3. The PSR does not identify this woman.

9

(per curiam) (unpublished) (affirming departure under U.S.S.G. § 4A1.3 based upon prior lenient treatment); United States v. Lamb, 155 F.3d 562, 1998 WL 413995, at *4 (4th Cir. 1998) (per curiam) (unpublished table decision) (affirming departure under U.S.S.G. § 4A1.3 based, in part, on prior lenient sentencing for a serious offense).

Second, the court determines that an upward departure under section 5K2.21 is also appropriate and that the court should increase defendant's total offense level. See Newsom, 508 F.3d at 733 (increasing defendant's offense level based on uncharged drug distribution and illegal weapons possession). While unlawfully present in the United States, Diaz-Galiana, unlawfully possessed seven firearms and over 1,000 rounds of ammunition, including one pistol that he admitted possessing. The guidelines do not take these weapons into account in calculating Diaz-Galiana's total offense level. See U.S.S.G. § 2L1.2; PSR ¶¶ 46–54.

Next, the court addresses the extent of the upward departure. A district court may exercise its discretion under the guidelines not to depart. See, e.g., Cash, 983 F.2d at 561. A court that elects to depart upwardly under section 4A1.3 must move horizontally across successive criminal history categories up to category VI, and, if category VI is inadequate, is to then vertically traverse to successively higher offense levels. See, e.g., U.S.S.G. § 4A1.3(a)(4); United States v. Dalton, 477 F.3d 195, 200 (4th Cir. 2007). From category VI, the court must "structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." U.S.S.G. § 4A1.3(a)(4)(B). A court is free to depart more than one category or level. See, e.g., Dalton, 477 F.3d at 199. Furthermore, a court need not "go through a ritualistic exercise in which it mechanically discusses each criminal history category [or offense level] it rejects en route to the category [or offense level] that it selects." Id. (quotation omitted) (alterations in original).

10

Having found that Diaz-Galiana's criminal history category of III is woefully inadequate, the court exercises its discretion to depart. Based on the entire record, the court finds that criminal history category VI does not remotely reflect the extent and nature of Diaz-Galiana's criminal history or his near certain likelihood of recidivism. Accordingly, the court moves vertically down the offense level column to offense level 21. See, e.g., Dalton, 477 F.3d at 200. In doing so, the court moves to offense level 21 and finds that it adequately reflects the nature, number, and seriousness of Diaz-Galiana's prior convictions and the likelihood of Diaz-Galiana committing other serious crimes. Cf., e.g., United States v. Parker, 289 F. App'x 666, 668 (4th Cir. 2008) (per curiam) (unpublished) (affirming upward departure based on history of recidivism, nature of criminal conduct, and history of lenient punishments); Lamb, 1998 WL 413995, at *4; United States v. Stokes, 56 F.3d 62, 1995 WL 318566, at *1 (4th Cir. 1995) (per curiam) (unpublished table decision). As for section 5K2.21, the court believes that the dismissed weapons charge in count two is very serious and warrants a departure in offense level from 21 to 24. Coupling criminal history category VI and offense level 24 yields an advisory guideline sentencing range of 100 to 125 months' imprisonment. See U.S.S.G. § 5A (sent'g table).

B.

The court next considers whether the resulting advisory guideline sentencing range serves the factors set forth in 18 U.S.C. § 3553(a). The court recognizes its obligation to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. § 3553(a); see, e.g., Spears, 555 U.S. at 264–68; Gall, 552 U.S. at 49–50. These purposes include the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. See 18

11

U.S.C. § 3553(a)(2)(A)–(C). Of course, the court has considered, as appropriate, all of the factors set forth in 18 U.S.C. § 3553(a), and the arguments of counsel. The court must select a sentence in light of the section 3553(a) factors, and must adequately explain the rationale for its sentence. See Spears, 555 U.S. at 264–68; Gall, 552 U.S. at 46, 50; Carter, 564 F.3d at 328; Evans, 526 F.3d at 164–65.

Diaz-Galiana stands before the court at 56 years of age with a long, profound, and disturbing criminal history. Diaz-Galiana is a recidivist's recidivist. Notwithstanding defense counsel's effort to minimize or explain away Diaz-Galiana's criminal conduct in this case, defendant's actions in the offense of conviction are very serious and harm the community. Indeed, instead of rejecting a criminal lifestyle following the multitude of chances, Diaz-Galiana again returned illegally to the United States and also engaged in additional dismissed felonious criminal conduct involving firearms. Both specific and general deterrence are critical in this case, particularly given Diaz-Galiana's serious offense behavior, abysmal criminal record, absolute lack of respect for the law, and near certain likelihood of recidivism. Society has long needed protection from Diaz-Galiana and today will receive it.

The court has considered defense counsel's arguments for a sentence well below the new advisory guideline range and finds that defendant has no intention to change his criminal behavior any time soon. Cf. Spears, 555 U.S. at 266–68 (emphasizing advisory nature of guidelines and authority of district court to sentence outside the advisory guideline range where a district court grounds the sentence in the section 3553(a) factors); Gall, 552 U.S. at 51–52 (noting the institutional advantage that district courts have over appellate courts in assessing credibility and gaining insight needed to find facts and adjudge their import under section 3553(a)). Defense counsel seeks to minimize or explain away the nature of Diaz-Galiana's most recent criminal conduct. For example,

12

Diaz-Galiana claims "[t]he offense occurred because [he] sincerely believed his life was in danger." Def.'s Sent'g Mem. 1. Diaz-Galiana explains that he fled Michoacán, Mexico out of fear and came to the United States because he has "prominent family ties including four grown children." Id. at 2. Diaz-Galiana also claims that he was "repeatedly threatened with the kidnapping of his wife and children." Id. at 5. In support of his claims concerning fear, Diaz-Galiana has submitted a number of news articles describing violence in Playa Azul, Michoacán, Mexico. Diaz-Galiana's counsel also cites the proceeds from the sale of Diaz-Galiana's condemned property as creating an anchor to permit Diaz-Galiana to move with his young family to Costa Rica. Finally, defense counsel notes that Diaz-Galiana is 56 and "entering an age where people tend to slow down or stop their immature and self-destructive behavior." Id. at 6.

Even accepting Diaz-Galiana's purported fear concerning himself and his young family, it does not justify his return to the United States or the additional criminal behavior once here. Regardless of his motivation, it was illegal for Diaz-Galiana to return again to the United States, a fact he knew all too well. As for his alleged motive to return due to his "prominent family ties" to his four grown children, according to the PSR, Diaz-Galiana's four children with his first wife reside in California, not North Carolina. See PSR ¶ 34; cf. supra, p. 8 n.8 (noting that Diaz-Galiana and one of his adult sons are facing drug charges in Robeson County, North Carolina). Moreover, the court has considered Diaz-Galiana's expression of remorse and request for yet another chance, and the court does not believe that defendant is credible. In fact, the court believes that Diaz-Galiana has no intention of changing his criminal lifestyle. Furthermore, Diaz-Galiana's claim that violent members of a Mexican drug cartel threatened to kidnap his young family and thereby prompted him to flee to North Carolina (while leaving his young children in Mexico) borders on the absurd. Likewise, the notion that the proceeds from the sale of his real property in Michoacán, Mexico will

13

cause Diaz-Galiana to remain with his young family in Mexico or Costa Rica and keep him from returning to the United States is not credible. As for defense counsel's citation of Diaz-Galiana's age and traditional recidivism statistics, Diaz-Galiana defies traditional recidivism statistics in that he has continued to commit crimes into his fifties. In short, the time for second, third, fourth, or fifth chances has long past for Diaz-Galiana.

The court shall impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and affords adequate deterrence to criminal conduct (both to Diaz-Galiana personally and others like him). The sentence also will provide the public much needed protection from further crimes of Diaz-Galiana. Thus, for the reasons explained above and in open court, defendant Diaz-Galiana is hereby sentenced to 120 months' imprisonment.

Alternatively, the court notes that it would impose the same sentence as a variance sentence even if it has incorrectly calculated the advisory guideline sentencing range or incorrectly departed. See, e.g., United States v. Savillon-Matute, 636 F.3d 119, 123–24 (4th Cir. 2011); United States v. Alvarado Perez, 609 F.3d 609, 619 (4th Cir. 2010) (Shedd, J. concurring); United States v. Keene, 470 F.3d 1347, 1348–50 (11th Cir. 2006); see also Grubbs, 585 F.3d at 804; Evans, 526 F.3d at 164–66; United States v. McClung, 483 F.3d 273, 277 (4th Cir. 2007). For the reasons explained above and in open court concerning section 3553(a) and the record in this case, the court believes that the alternative variance sentence of 120 months' imprisonment is the sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in [the sentencing statute]." 18 U.S.C. § 3553(a); cf., e.g., Spears, 555 U.S. at 264–68; Evans, 526 F.3d at 162–66 (affirming variance sentence of 125 months, even though advisory guideline range before upward departure was 24 to 30 months); United States v. Vowell, 516 F.3d 503, 511–13 (6th Cir. 2008) (affirming variance

14

sentence of 780 months, even though advisory guideline range was 188 to 235 months); United States v. Pinson, 542 F.3d 822, 836–38 (10th Cir. 2008) (affirming variance sentence of 240 months, even though advisory guideline range was 84 to 105 months). Again, the court notes that Diaz-Galiana's conduct, both in this case and his criminal history generally, is serious, that he is a recidivist's recidivist, and that society needs protection from him. Furthermore, Diaz-Galiana has repeatedly demonstrated a lack of respect for the law despite repeated leniency. See United States v. Turcios-Flores, 368 F. App'x 397, 398–99 (4th Cir. 2010) (per curiam) (unpublished). The court announced the balance of defendant's sentence in open court and also described defendant's appellate rights.

IV.

The court has imposed defendant's sentence for the reasons discussed herein and the reasons discussed in open court, which are incorporated by reference. The order is intended to provide a statement of reasons for defendant's sentence, and does not alter or amend the court's judgment announced in open court.

SO ORDERED. This 11 day of August 2011.

JAMES C. DEVER III
United States District Judge